305 F.2d 949
 Benjamin BRAUNSTEIN and Diana Braunstein; Estate of Benjamin Neisloss, Deceased, Julia Neisloss and Russell Neisloss, Executors and Julia Neisloss; Harry Neisloss and Lillian Neisloss, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 256-258.
 Docket 27146-27148.
 United States Court of Appeals Second Circuit.
 Argued May 22, 1962.
 Decided July 6, 1962.
 
 Thurman Arnold and Louis Eisenstein, Washington, D. C. (Julius M. Greisman and Arnold, Fortas & Porter, Washington, D. C., on the brief), for petitioners.
 David O. Walter, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Dept. of Justice, on the brief), for respondent.
 Before LUMBARD, Chief Judge, and SMITH and MARSHALL, Circuit Judges.
 LUMBARD, Chief Judge.
 
 
 1
 The taxpayers,[1] who had previously been active in constructing homes and apartment buildings, formed two corporations in 1948 for the purpose of building apartment houses in a development called Oakland Gardens in Bayside, Queens County, New York, to be financed under § 608 of the National Housing Act.[2] The Federal Housing Administration (FHA) guaranteed mortgage loans to the two corporations which then built the proposed projects. Each corporation had an excess of mortgage loan funds remaining after the costs of construction had been paid. In 1950, the year following completion of construction, the three taxpayers sold their stock in both corporations at a profit and, as part of the sale transaction, received distributions which included the excess mortgage funds from the two corporations. The taxpayers reported the excess of the amounts they received — both on the distributions from the corporations and on sale of their stock — over their bases in the stock and the expenses of sale as long-term capital gains of $313,854.17 each. The Commissioner asserted that the two corporations were collapsible corporations under § 117(m) of the Internal Revenue Code of 1939[3] so that the gains from the distributions and from the sale of the stock were ordinary income. In a decision which was reviewed by the full court, the Tax Court upheld the Commissioner with one judge dissenting. 36 T.C. 22 (1961). The taxpayers appeal, and we affirm.
 
 
 The Taxpayers Had the Requisite View During Construction
 
 
 2
 According to § 117(m) (1) of the 1939 Code, gain from the sale or exchange of stock of a "collapsible corporation," which gain, but for § 117(m), would be long-term capital gain, is ordinary income. According to § 117(m) (2) (A), a corporation is a "collapsible corporation" if it is formed or availed of principally for the construction of property "with a view to * * * the sale or exchange of stock by its shareholders * * * or a distribution to its shareholders, prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property" and "with a view to * * * the realization by such shareholders of gain attributable to such property." This "view" is present "whether such action [sale or exchange of the stock or distribution to shareholders] was contemplated unconditionally, conditionally, or as a recognized possibility." Treas.Reg. 111, § 29.117-11(b) (1953). The "view" to such sale or distribution must exist at some time "during construction." Treas.Reg. 111, § 29.117-11 (b) (1953). See Jacobson v. Commissioner, 281 F.2d 703 (3 Cir. 1960). But see Glickman v. Commissioner, 256 F.2d 108, 110-111 (2 Cir. 1958) (dictum). Thus, if "the sale, exchange, or distribution is attributable to circumstances present at the time of * * * construction * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of." Treas.Reg. 111 § 29.117-11(b) (1953). The regulations state that when a corporation's construction of property is substantial in relation to its other activities and its shareholders sell their stock or receive a distribution, thus recognizing a gain before the corporation has realized a substantial part of the net income from the property, these facts will ordinarily be sufficient, in the absence of other facts, to establish that the corporation is collapsible. Treas.Reg. 111, § 29.117-11(d) (1953).
 
 
 3
 In an attempt to satisfy their burden of proof that they did not have the requisite view to sale or distribution during construction the taxpayers make two main arguments. They contend that they intended the two corporations to be repositories for the accumulation of substantial estates for their families, and thus meant the corporations to be long-term investments. They further contend that the distributions and sales were attributable to an unanticipated decline in the profitability of the two corporations — a decrease in rent income and an increase in expenses — which occurred after construction was completed. The Tax Court found that although the taxpayers may have been attempting to make profits, the facts were inconsistent with the use of the two corporations as a repository for these profits. The Tax Court also found that the facts did not bear out the taxpayers' claims that there was an unexpected decline in profitability after the completion of construction. We conclude that the Tax Court was not wrong when it found that the taxpayers had the requisite "view" prior to the completion of the two projects.[4]
 
 
 4
 Although Benjamin Neisloss testified that the two corporations were intended as a long-term repository for the accumulation of a large estate, the Tax Court need not accept the unsupported testimony of an interested party. See, e. g., Hartman v. Commissioner, 296 F.2d 726, 727-728 (2 Cir. 1961); Payne v. Commissioner, 268 F.2d 617, 621 (5 Cir. 1959); Cohen v. Commissioner, 148 F.2d 336 (2 Cir. 1945). Thus it is necessary for us to examine the facts to see if they lend support to the taxpayers' contention.
 
 
 5
 Benjamin and Harry Neisloss were brothers active in various real estate construction enterprises since 1919. Benjamin Braunstein is an architect who had been associated with the other two since about 1930. Beginning in 1943 the three taxpayers organized and were equal stockholders in seven corporations which constructed multiple dwelling gardentype apartments financed under § 608 of the National Housing Act. After the passage of between one and ten years from the completion of these projects, the taxpayers sold their stock in the seven corporations in 1949, 1950, and 1953. This case concerns the distribution of cash and the sale of the stock of two of these corporations.
 
 
 6
 On March 31, 1948 Springfield Development Company, Inc., and Hill Development Company, Inc., were incorporated. Each of the three taxpayers purchased ten shares of the common A stock of each corporation for $1 per share. The FHA purchased 100 shares of each corporation's preferred stock for $1 per share. Thus the two corporations' total paid-in capital was only $260. The taxpayers and their other corporations made loans to Springfield and Hill which were repaid out of the mortgage loan proceeds. Although such a nominal capitalization is not wholly inconsistent with the taxpayers' claims that they intended Springfield and Hill as a repository for the accumulation of their estates, it certainly does not lend weight to their contentions.
 
 
 7
 Previously the taxpayers had obtained a commitment from the FHA for mortgage loan insurance for the two projects, which were in fact parts of a single overall development. The FHA's total estimated cost of the projects was $6,845,804 and the total mortgage insurance commitments were $6,101,600. Both corporations entered into loan agreements with the Bank of Manhattan Company to advance the amount of the FHA mortgage insurance commitment with 4% interest.
 
 
 8
 Springfield and Hill entered into contracts with the N. B. Construction Company, Inc., of which the three taxpayers were equal shareholders, for the construction of the projects.[5] Although these contracts specified a lump sum consideration, in practice Springfield and Hill merely reimbursed N. B. Construction for its costs.
 
 
 9
 Construction was begun in April 1948 and the various buildings were completed between September 1948 and June 1949. The costs of construction were less than had been estimated. Instead of contracting out the carpentry and plumbing work, the taxpayers had their own men do the work, saving $80,000 on carpentry and $85,000 on plumbing and heating. A decline in the cost of lumber resulted in a saving of $50,000. There were other savings amounting to nearly $90,000 in title and recording expenses and legal and organizational expenses. Furthermore, the FHA cost estimates had included $599,741 as the total builder's and architect's fees to be incurred by Springfield and Hill. N. B. Construction acted as builder (in addition to doing the construction work) and Benjamin Braunstein acted as architect for the two corporations without pay,[6] thus saving nearly $600,000 more.
 
 
 10
 Thus the mortgage loan proceeds exceeded the cash expenditures in constructing the two projects by more than $150,000. These excess funds were not used to prepay a part of the corporations' large mortgage indebtedness which was costing them 4% interest. Rather, these funds were loaned interest free to the taxpayers' other construction projects. Therefore, Springfield and Hill, far from accumulating the taxpayers' estate, were incurring uncompensated interest expenses while taxpayers' other corporations use the money to make a profit.
 
 
 11
 The land on which these projects were built was not owned by Springfield and Hill. In April and May 1947 Benjamin Neisloss entered into contracts to purchase the land for $120,000. On December 15, 1947, this land was conveyed to the wives of the three taxpayers who leased it to Springfield and Hill for 99 years at a total annual rental of $23,824, a rate which would repay the original cost in five years. In the FHA project analysis it was estimated that this land would be worth $595,600, five times its purchase price, after the projects were built. Although the legality or the propriety of this transaction is not questioned, it is evident that burdening the corporations with a substantial long-term rent obligation and shifting the benefit of the increase in value of the land due to the construction thereon from the corporations to the taxpayers' wives are not consistent with the taxpayers' claimed purpose to make Springfield and Hill long-term repositories of their increased estates.
 
 
 12
 These facts — nominal capitalization, interest free loans, and ownership of the land by the taxpayers' wives — while not necessarily inconsistent with Neisloss' testimony that the taxpayers intended to hold Springfield and Hill as long-term investments, lend little support to it. We turn now to the taxpayers' other contention, that the decision to sell was due solely to circumstances arising after construction which could not reasonably have been anticipated at the time of construction.
 
 
 13
 In making application for mortgage loan insurance the taxpayers submitted estimates of Springfield's and Hill's annual income and expenses. The FHA in making a project analysis made their own estimates. Rather than computing projected net income, the taxpayers and the FHA estimated net cash inflow, i. e., they started with estimated rent income and then deducted estimated cash expenses, estimated payments to the reserve for replacement of refrigerators, stoves, and equipment to be held by the mortgagee, and the amount of annual debt service (interest and principal payments and the cost of mortgage insurance), thus arriving at "Cash available for income taxes, corporate taxes, dividends and surplus." The estimates were as follows:
 
 
 14
 FHA Taxpayers'
 Estimate Estimate

 Springfield $53,925 $28,361
 Hill 24,916 16,631
 _______ ________
 Total $78,841 $44,992
 
 
 15
 The Tax Court found that in entering into the project the taxpayers were relying upon their own estimates and not on the FHA's higher predictions.
 
 
 16
 The taxpayers claim that decreases in rental income which were not expected when construction was completed and increases in operating expenses which were also unanticipated reduced the cash available for taxes, dividends and surplus to a deficit of $20,000 per year, and that the projects, far from being self-liquidating, would then have required the taxpayers to make annual contributions to the corporations' capital. This unexpected turn of events, rather than a previously held view to sale, the taxpayers argue, prompted them to decide to sell in late May 1950. The taxpayers compute the $20,000 annual deficit as follows:
 
 
 17
 FHA's estimated annual
 cash surplus $78,841
 _______
 Less: Increased real estate
 taxes $30,000
 Cost of garbage and
 rubbish removal 10,000
 Cost of furnishing
 free gas and electricity
 to tenants 31,000
 Decline in rental
 income 16,000
 Increased costs of
 redecorating 10,000
 ________
 $97,000
 ________
 Cash deficit $18,159
 ========
 
 
 18
 After examining all these factors which the taxpayers allege contributed to the purported cash deficit of nearly $20,000, we find that there was in fact no cash deficit and that the project, although not doing quite as well as the taxpayers had predicted, was earning a cash surplus. It is necessary to examine each of the factors which purportedly contributed to this nearly $20,000 annual cash deficit.
 
 
 19
 During early 1950 the New York newspapers predicted a large real estate tax increase. When the rate on Springfield's and Hill's property was fixed in June 1950 these predictions proved true. The FHA's and the taxpayers' estimates of real estate taxes and the actual 1950-51 tax in total for Springfield and Hill are as follows:
 
 
 20
 FHA's Estimates $133,668
 Taxpayers' Estimate 168,617
 Actual 1950-51 real
 estate tax 163,663
 
 
 21
 The taxpayers, in calculating their $20,000 annual cash deficit, rely upon the fact that actual real estate taxes exceeded the FHA's estimate by $30,000. However, since the actual tax fell $5,000 short of the taxpayers' own estimate, they cannot claim that the amount of the real estate taxes was an unexpected factor.
 
 
 22
 In April 1949 the City of New York discontinued its service of garbage and rubbish removal. Thus the projects were forced to procure this service from a private contractor at a cost of approximately $8,500 a year which had not been anticipated at the time the estimates were made. The government argues that since the taxpayers were aware of this expense just before construction was completed in June 1949, to the extent that it produced a view to sell, this view was held "during construction." See Glickman v. Commissioner, 256 F.2d 108, 111 (2 Cir. 1958). However, it has been argued that if a view to sell first arose after all the decisions affecting construction had been made and construction was largely completed, the view did not arise early enough to make the corporation collapsible. McLean, Collapsible Corporations — The Statute and Regulations, 67 Harv.L.Rev. 55, 61-62 (1953). Even accepting arguendo the latter position, we think that the Tax Court was correct. Thus we assume that this expense of $8,500 per year arose after construction was sufficiently near completion.
 
 
 23
 Springfield and Hill had not intended to provide free gas and electricity to their tenants. However, since various competing projects did provide free utilities, Springfield and Hill had difficulty attracting and retaining tenants. Thus, by May 1950 the taxpayers decided that Springfield and Hill would have to meet competition and furnish free utilities. The cost of such a step was estimated at $31,000 per year. It appears that this expense was unexpected and might have reduced the projects' profitability unless the rents were increased slightly. Although the Federal Housing Regulations did not permit the taxpayers to increase rents without the district director's approval, Neisloss testified that the FHA entertained applications for increases if actual operating costs exceed the estimates. Of course, the competitive situation might have prevented an increase in rents and to that extent the cost of utilities would have reduced the net cash income.
 
 
 24
 The taxpayers also claim that the vacancy rates exceeded the 7% vacancies used by the FHA and the taxpayers in making their estimates. However, during the period in question, the first half of 1950, the taxpayers had not yet begun to supply free utilities. Since Springfield's and Hill's failure to meet competition during these months was probably a major cause of their high vacancy rate and since the taxpayers had decided to supply free utilities, the loss of revenues from excessive vacancies must be disregarded in predicting the projects' future net cash income. Similarly, once Springfield and Hill met competition the turnover of tenants would be reduced and the claimed redecorating costs pro tanto reduced. Thus the increased decorating costs and reduced rental income cannot be considered cumulatively with the cost of gas and electricity, but should be considered alternatively.
 
 
 25
 Taking the unexpected cost of utilities and garbage removal into account, the project would still have been expected to produce an annual cash surplus. The two corporations' actual results for the period before and after May 1950 bear out this conclusion. Before construction had begun the taxpayers estimated that Springfield's annual cash surplus would be $28,361 and Hill's $16,631. The projects' actual cash surplus was as follows:[7]
 
 
 26
 1950 1951

 Springfield
 (Year ended
 Aug. 31) $85,133 $27,351
 Hill
 (Year ended
 Jan. 1) 8,978 11,596
 
 
 27
 It is difficult to believe that this small decrease, which is all the taxpayers had cause to expect, would have caused experienced real estate operators like the three taxpayers to sell their stock unless they had a previous view to its sale. Were the courts to permit any minor adversity to serve as the pretext for a previously contemplated disposition, the collapsible corporation provision would indeed have a narrow scope. Thus, we must distinguish between those events which truly motivate a change in existing plans and those which merely operate as a trigger.
 
 
 28
 The taxpayers argue that this analysis is altogether too objective since the question in issue is whether the taxpayers subjectively had a view to sell during construction. However, only by determining the objective facts and attempting to ascertain their effect on the taxpayers' minds can the court assess Benjamin Neisloss' self-serving testimony that the taxpayers had no view to sell until after construction had been completed.[8]
 
 
 29
 In late May 1950 the taxpayers were approached by brokers on behalf of prospective purchasers, and in early June a contract was signed setting the price for all of Springfield's and Hill's stock at $400,000 subject to various plus and minus adjustments. Since the purchasers did not want to pay for a large amount of cash held by the corporations, Springfield and Hill increased the book value of its assets and declared dividends to the taxpayers totalling $555,000.[9] Since neither Springfield nor Hill had any accumulated earnings and profits at the time of the distribution or any earnings and profits for its taxable year in which the distributions were made, the distributions were not dividends for income tax purposes. Internal Revenue Code of 1939, § 115(a), 26 U.S.C.A. § 115(a).[10] The final sale price of all the stock was $399,702. Taxpayers reported a total long-term capital gain on their 1950 income tax returns as follows:
 
 
 30
 Distributions from
 Springfield and Hill $555,000
 Selling price of Springfield
 and Hill stock 399,702
 _________
 $954,702
 _________
 Less
 Cost of stock $ 60
 Expenses of sale 13,079
 _________
 $ 13,139
 _________
 Gain $941,563
 =========
 
 
 31
 Since we do not think that the Tax Court was wrong in concluding that the taxpayers had the requisite view to sale during construction, this gain is ordinary income unless for some other reason the collapsible corporation provision does not apply.
 
 
 More than 70% of the Gain Was Attributable to the Constructed Property
 
 
 32
 Section 117(m) does not apply to this gain "unless more than 70 per centum of such gain is attributable to the property so * * * constructed." 1939 Code § 117(m) (3) (B). The taxpayers claim that more than 30% of the gain is due to retained rental income and that such gain is not "attributable to the property so * * * constructed." Since we find that less than 30% of the gain was due to retained income, we need not decide whether the regulations which broadly interpret "gain attributable to the property," apparently to include gain attributable to retained rental income, Treas.Reg. 111, § 29.117-11 (c) (3), are valid. Compare Spangler v. Commissioner, 278 F.2d 665, 670-671 (4 Cir. 1960), cert. denied, 364 U.S. 825, 81 S.Ct. 63, 5 L.Ed.2d 54 (1960); Bryan v. Commissioner, 281 F.2d 238, 241 (4 Cir., 1960), cert. denied, 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364 (1961) (upholding the regulation), with McLean, supra note 8, at 79-80; DeWind & Anthoine, supra note 8, at 516; Anthoine, Recent Developments in Collapsible Corporations, New York University 14th Annual Institute on Federal Taxation 761, 782 (1956) (rejecting the regulation).
 
 
 33
 Springfield and Hill reported net losses on their income tax returns for the period that the taxpayers held their stock. However, in computing the amount of rental income that the two corporations accumulated, the taxpayers ask us to exclude two classes of deductions taken by the corporations on their income tax returns. But even if we agree with them as to the first, depreciation, which is a non-cash expense, the taxpayers' argument falls short. The monthly payments to the mortgagee for replacement of equipment should then be regarded as coming out of operating revenues. The replacement of existing equipment is a prerequisite to continued operations. Therefore, we reject the taxpayers' claim that payments to the reserve for replacement should be treated as coming prorata from the excess mortgage proceeds and the accumulated rental income. And we disagree with the taxpayers as to the second, interest and real estate taxes incurred during construction. Since the corporations chose to deduct these expenses on their income tax returns, we regard them as having been made out of operating income rather than out of the excess mortgage proceeds as the taxpayers argue. Consequently, less than 30% of the gain was due to accumulated operating income.
 
 
 Section 117(m) Applies Even if Sale of the Corporate Assets Would Have Produced Capital Gain Had No Corporation Existed
 
 
 34
 The taxpayers' final argument is that § 117(m) should not apply if the constructed apartment buildings would have produced capital gain on a sale by the taxpayers had no corporation been formed. We reject this argument which has, however, been recently accepted by the Fifth Circuit in United States v. Ivey, 294 F.2d 799 (5 Cir. 1961) (2-1), rehearing denied with opinion, 303 F.2d 109 (1962) (2-1).[11] The argument goes as follows:
 
 
 35
 If a taxpayer who is engaged in a trade or business constructs an asset which he holds primarily for sale in the ordinary course of his trade or business, any gain from the sale of the asset is ordinary income. 1939 Code § 117(a) (1) (A), (j) (1). Before the collapsible corporation provision was passed, a taxpayer could have formed a corporation to construct the asset and upon sale of the corporation's stock recognized capital gain instead of the ordinary income he would have received had no corporation been used. Therefore, the taxpayer argues, the collapsible corporation provision was enacted to give the taxpayer ordinary income on the sale of the stock just as he would have had ordinary income on the sale of the asset, and if the taxpayer, had he constructed and sold the asset himself, would not have had ordinary income on its sale, the collapsible corporation provision should not apply.
 
 
 36
 The collapsible corporation provision as literally written applies regardless of whether the assets constructed by the corporation would have produced capital gain or ordinary income if constructed and sold by the shareholder. Although this occasionally produces unwarranted taxation of capital gains as ordinary income, for the courts to rewrite the very complex legislation embodied in § 117(m) of the 1939 Code and its successor, § 341 of the 1954 Code, would produce even more confusion.[12]
 
 
 37
 The taxpayers in this case and the Fifth Circuit in Ivey assume that the sole purpose of the collapsible corporation provision was to deal with those cases where the shareholder would have had ordinary income if he had sold the assets himself. However, the legislative history discloses that § 117(m) has another major purpose. H.R.Rep. No. 2319, 81st Cong., 2d Sess. 56-57, 97 (1950); Sen.Rep. No. 2375, 81st Cong., 2d Sess. 45, 89 (1950); H.R.Rep. No. 586, 82nd Cong., 1st Sess. 25 (1951); Sen.Rep. No. 781, 82nd Cong., 1st Sess. 33 (1951). See also DeWind & Anthoine, supra note 8, at 475-77 (1956); Note, Legislative Response to the Collapsible Corporation, 51 Colum.L.Rev. 361-62 (1951); Bittker, supra note 12, at 299-300. If an individual made a movie or constructed an apartment building, income received from the rental of the movie or building would be ordinary income. Thus some taxpayers formed a corporation to make the movie or construct the apartment building and then liquidated the corporation after the movie or the building was finished. On liquidation the shareholders were taxed at capital gain rates on the difference between their basis in the stock and the fair market value of the movie or apartment building but the shareholders' basis in the movie or apartment building was stepped-up to fair market value. The shareholders could then rent out the movie or apartment building and amortize or depreciate their stepped-up basis against rental income. Congress enacted § 117(m) to make the shareholders' gain on liquidation ordinary income rather than capital gain. If an individual had made a movie with the intention of renting it, he would have capital gain on a subsequent sale since it would not have been held primarily for sale to customers in the ordinary course of his trade or business. Therefore, the collapsible corporation provision was intended to apply to some cases when the asset if sold by the taxpayer would have produced capital gain. However, if the Ivey decision is applied where a movie is made by a corporation which is then dissolved, the collapsible corporation provision will have no application to the basic fact situations which prompted its enactment.
 
 
 38
 Of course, this difficulty could be remedied by interpreting the Ivey decision as applicable only to sales of stock and not to liquidations. Thus, when the stock of a corporation is sold, it would not be collapsible if the underlying assets would have produced capital gain had no corporation been used, but when a corporation is liquidated, it would be collapsible regardless of whether the underlying assets would have produced capital gain had no corporation been formed. However, since Congress chose to use a single statute to deal with both types of cases, it seems unwise for the courts to create the additional complexities inherent in such a two-fold interpretation. In 1958 Congress, in fact, adopted slightly different tests for collapsibility on liquidation and on sale of stock. Compare 1954 Code § 341(e) (1), with 1954 Code § 341(e) (2), (4). See Sen.Rep. No. 1983, 85th Cong., 2d Sess. 33-34 (1958), U.S.Code Cong. and Adm.News 1958, p. 4791. The multiplicity of detailed rules which this dual statutory test necessitated make it manifest that such an approach should not be effected by judicial decision.
 
 
 39
 Moreover, even as applied to the sale of stock situation, the Ivey decision departs from the Code's consistent framework for taxing collapsible corporations. According to the opinion denying a rehearing in Ivey, 303 F.2d 109 (1962), if all the literal requirements of § 117(m) of the 1939 Code or its successor, § 341 of the 1954 Code, are satisfied, the court should disregard the shareholders' holding period for their stock and treat the shareholders as if they had owned the corporation's assets directly. Thus, any assets which the corporation has acquired within six months and which would be capital assets in the shareholders' hands will produce short-term capital gain while those held longer than six months will produce long-term capital gain. Regardless of the theoretical wisdom of this approach, it has no basis in the collapsible corporation provision which Congress has enacted. One of the clear policy decisions embodied in § 117(m) and its successor is the treatment of all or none of the gain as long-term capital gain, i. e., the refusal to split the gain between long-term capital gain and ordinary income. See Cohen, Tarleau, Surrey & Warren, A Proposed Revision of the Federal Income Tax Treatment of the Sale of a Business Enterprise — American Law Institute Draft, 54 Colum.L.Rev. 157, 173-74, 177 (1954); Commissioner of Internal Revenue v. Kelley, 293 F.2d 904, 912-913 (5 Cir. 1961).
 
 
 40
 Furthermore, regardless of how compatible with the statute the Ivey interpretation may have been previous to 1958, the addition of § 341(e) in that year makes Ivey's interpretation of the collapsible corporation provision anomalous. Although § 341(e) did not completely eliminate the conversion of capital gain into ordinary income by the collapsible corporation provision, it was designed to narrow the imposition of ordinary income treatment in an Ivey type of case where the shareholder would have recognized capital gain had he constructed and sold the asset without the use of a corporation. Sen.Rep. No. 1983, 85th Cong., 2d Sess. 31-32 (1958); Bittker, supra note 12, at 310-313-14. However, Ivey went further than § 341(e) in narrowing the scope of the collapsible corporation provision.[13] Therefore, if Ivey is correct, either § 341(e) is unnecessary or, if it is regarded as overruling Ivey, it expands rather than contracts the application of the collapsible corporation provision, clearly the contrary of what Congress intended. See Sen.Rep. No. 1983, 85th Cong., 2d Sess. 31-32 (1958).
 
 
 41
 Although the courts must often interpret sections of the Internal Revenue Code in light of their purposes in order to carry out Congressional intent, see, e. g., Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 53-54, 76 S.Ct. 20, 100 L.Ed. 29 (1955); Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), when this would require the courts to extensively rewrite clear statutory language, the task of revision should be left to Congress, see, e. g., Hanover Bank v. Commissioner, 82 S.Ct. 1080 (1962).
 
 
 42
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Diana Braunstein, Julia Neisloss, and Lillian Neisloss are included in this proceeding only because they filed joint returns with their husbands, Benjamin Braunstein, Benjamin Neisloss and Harry Neisloss, respectively. The three husbands will herein be referred to as the taxpayers. Benjamin Neisloss is now deceased, his estate having been substituted as a party herein
 
 
 [2]
 The taxpayers formed two corporations rather than one because § 608(b) (3) of the National Housing Act, 12 U.S.C.A. § 1743(b) (3), prohibits loans beyond $5,000,000 to any one mortgagor
 
 
 [3]
 § 117(m) —
 "(1) Treatment of gain to shareholders. Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.
 "(2) Definitions. —
 "(A) For the purposes of this subsection, the term `collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to —
 "(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and
 "(ii) the realization by such shareholders of gain attributable to such property.
 * * * * * * *
 "(3) Limitations on application of subsection. — In the case of gain realized by a shareholder upon his stock in a collapsible corporation —
 "(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;
 "(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and
 "(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production. * * *"
 [As added by § 212(a) of the Revenue Act of 1950, c. 994, 64 Stat. 906, 26 U.S. C.A. § 117(m).]
 
 
 [4]
 Although Judge Kern, the only judge to hear the oral testimony, dissented, the weight of the Tax Court's findings is not lessened because, as Judge Kern recognized, few of "the evidentiary facts are themselves in dispute," 36 TC at 88
 
 
 [5]
 This corporation was later succeeded by N. B. Construction Company, a partnership consisting of the three taxpayers, which completed the work. The corporation and partnership are regarded as interchangeable for purposes of this opinion
 
 
 [6]
 Both of their contracts called for payment of fees in Common B stock. But shortly after entering these contracts both N. B. Construction and Braunstein released Springfield and Hill from their obligations to transfer the Common B stock
 
 
 [7]
 These figures were obtained by taking each corporations' net loss as reported on its federal income tax return, adding back non-cash depreciation expense and interest and insurance on the mortgage, and then subtracting the FHA's estimated annual payments for debt service (including interest and principal and mortgage insurance) and the annual payments to the reserve for replacement of equipment
 
 
 [8]
 McLean, Collapsible Corporations — The Statute and Regulations, 67 Harv.L.Rev. 55, 65-66 (1953); DeWind & Anthoine, Collapsible Corporations, 56 Colum.L. Rev. 475, 483 (1956)
 
 
 [9]
 Since Springfield and Hill had loaned most of their excess cash to taxpayers' other enterprises, part of the $555,000 distribution was made by a set of bookkeeping entries rather than through an actual cash distribution
 
 
 [10]
 Section 312(j) of the 1954 Code, 26 U.S.C.A. § 312(j), applicable to distributions made after June 22, 1954, would have caused these distributions to be treated as dividends by increasing the corporations' earnings and profits by the amount of the excess of the FHA guaranteed loans over the adjusted basis of the buildings. However, under the 1939 Code, unless the collapsible corporation provision applies, the distributions would be treated as capital gains to the extent that they exceed the shareholder's basis. 1939 Code, § 115(d); Commissioner of Internal Revenue v. Gross, 236 F.2d 612 (2 Cir. 1956), aff'g. 23 T.C. 756 (1955)
 
 
 [11]
 See also Honaker Drilling, Inc. v. Koehler, 190 F.Supp. 287 (D.Kan.1960), where the district court utilized this argument to find that the corporation was not availed of with the requisite view
 
 
 [12]
 The commentators have generally assumed that the collapsible corporation section would be literally interpreted by the courts. See, e. g., DeWind & Anthoine, supra note 8, at 487, 508-09, 533; Anthoine, Collapsible Corporations; 1957 Developments, New York Univ. 16th Annual Institute on Federal Taxation 659, 661 (1958); 3B Mertens, Federal Income Taxation § 22.64, p. 271; Mertens, Federal Income Taxation, Code Commentary, § 341(b) (3): 1; Bittker, Federal Income Taxation of Corporations and Shareholders 309-10 (1959)
 
 
 [13]
 Section 341(e) was not applicable in Ivey since the operative facts had taken place before its enactment. Although § 341(e) had been enacted before the Fifth Circuit decided Ivey, the court did not discuss the statutory amendment