Jack D. Saltzman, Transferee v. Commissioner. One Fifteen Fairview Avenue Corp. v. Commissioner.
Saltzman v. Commissioner
Docket Nos. 94058 and 94059.
United States Tax Court
T.C. Memo 1963-80; 1963 Tax Ct. Memo LEXIS 266; 22 T.C.M. (CCH) 336; T.C.M. (RIA) 63080; March 18, 1963
Edwin Fradkin, Esq., for the petitioners. Gerald N. Daffner, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined *268 a deficiency in the income tax of One Fifteen Fairview Avenue Corp. for its fiscal year ended September 30, 1958, in the amount of $14,529.75 and determined that Jack D. Saltzman was liable as transferee of that corporation for his deficiency, plus interest, as provided by law. Jack D. Saltzman admits liability as transferee of One Fifteen Fairview Avenue Corp. to the extent of any deficiency determined herein to be due by that corporation plus interest as provided by law. The issue for decision is whether the corporation was a collapsible corporation within the meaning of section 341(b) of the Internal Revenue Code of 1954[1] so as to make the nonrecognition provisions of section 337(a) inapplicable to a gain realized by the corporation upon the sale of its principal asset. Findings of Fact Some of the facts have been stipulated and are found accordingly. Jack D. Saltzman (hereinafter referred to as petitioner) is an individual residing in Jersey City, New Jersey. Petitioner is engaged in the business of a wholesaler of electrical supplies and equipment and has been so engaged *269 since 1948. Until sometime in 1959, petitioner was the sole shareholder of Garfunkel Company, a New Jersey corporation, through which he conducted this electrical supply and equipment business. One Fifteen Fairview Avenue Corp. (hereinafter referred to as One Fifteen), is a New Jersey corporation which was in-corporated on October 5, 1956. Among the purposes for which One Fifteen was formed according to its certificate of incorporation was the purchase, exchange, sale or conveyance of real estate or other property, personal or mixed. At all times herein material petitioner was the sole shareholder of One Fifteen. At all times herein material One Fifteen has used the cash receipts and disbursements method of accounting and a fiscal year ending September 30 as the basis for reporting income for Federal income tax purposes. It filed a corporate income tax return with the district director of internal revenue at Newark, New Jersey for its taxable year ended September 30, 1958. On July 2, 1956, an agreement was executed between Bellaire Realty Corporation (hereinafter referred to as Bellaire) a New Jersey corporation, as seller, and M. R. Saltzman, Inc., a New Jersey corporation, *270 as purchaser, wherein Bellaire agreed to convey to M. R. Saltzman, Inc., the land and premises located at 115-117 Fairview Avenue, Jersey City, New Jersey. Bellaire had owned this property since August 1943. The agreement called for a purchase price of $175,000 of which $5,000 was payable upon signing of the contract and $10,000 on delivery of the deed, with the balance to consist of mortgages. The property purchased consisted of land and a 5-story elevator apartment building containing 47 apartments, including one occupied by the superintendent. Although the building was approximately 30 years old at the date that the agreement referred to above was executed, it was considered a good substantial building, well maintained, well located, and relatively easy to manage and operate. On October 6, 1956, title was conveyed by Bellaire to One Fifteen instead of to M. R. Saltzman, Inc., under the contract of sale executed on July 2, 1956. During 1956 Louis Rubin (hereinafter referred to as Rubin) a broker, had discussed with petitioner tentative plans for investing in real estate, to supplement his income, and it was upon Rubin's advice that petitioner through the corporation, One Fifteen, *271 purchased the apartment building on Fairview Avenue. Until that time petitioner had never engaged in real estate activities other than as related to his electrical supply business. Rubin was a personal friend of petitioner's and he contemplated interesting petitioner in other real estate investments as well as the apartment house on Fairview Avenue. One Fifteen commenced operating the apartment house at the time of its purchase. The apartment house was fully occupied by tenants at that time and during the period One Fifteen owned the property it was approximately occupied in full by tenants with the exception of one apartment occupied by the superintendent. Rubin collected the rents, received the complaints of tenants and performed other functions necessary in the operation of the property while it was held by One Fifteen. He did not keep the books or sign the checks for One Fifteen. Rubin did not receive any compensation from One Fifteen for his services. When One Fifteen commenced operation of the apartment building the gross rentals received from the property were in the same amount that Bellaire had realized from the property prior to its sale to One Fifteen. On July 25, 1958, a *272 contract of sale was executed whereby One Fifteen, as seller, agreed to convey to Irving I. and Toby J. Crown, as purchasers, the apartment house located on Fairview Avenue in Jersey City, New Jersey for the sum of $235,000, exclusive of seller's or purchasers' credits. The terms of the sale called for a $5,000 deposit on the signing of the agreement and a payment of approximately $80,000 in cash and the assumption of a mortgage of approximately $150,000 upon delivery of the deed. On August 1, 1958, title was conveyed by One Fifteen to the Crowns and One Fifteen ceased operating the apartment property. At that time the property was approximately fully tenanted with the exception of the apartment occupied by the superintendent. The gain realized by One Fifteen on the sale of the property was $56,919. The gross rentals received by One Fifteen from the apartment property for the period from October 1956 to July 1957, inclusive, were approximately $3,500 per month, and the gross rentals received from August 1957 to July 1958, inclusive, were approximately $3,950 per month. The realty taxes paid by One Fifteen during the period that the corporation operated the property were in the *273 amount of $12,903 for the period October 1, 1956, to September 30, 1957, and $12,839.87 for the period October 1, 1957, to September 30, 1958. The operating expenses of One Fifteen during the period that it owned and operated the apartment property were as follows: Year ended
Year ended
Sept. 30,
Sept. 30,
1957
1958
Superintendent salary
$ 1,560.00
$1,430.00
Fuel oil
5,158.59
4,011.75
Repairs
1,560.21
1,293.67
Electric
823.91
673.34
Supplies
780.12
763.13
Elevator maintenance
385.00
350.00
Miscellaneous
147.60
231.24
Total operating ex-
penses
$10,415.43
$8,753.13
One Fifteen operated the property from October 1, 1956, to August 1, 1958, inclusive, a period of 22 months during which time there were no major improvements or repairs to the property. The taxable income derived by One Fifteen from the operation of the property amounted to $2,499.16 for the taxable year ending September 30, 1957, and $502.43 for the taxable year ending September 30, 1958. Rent control terminated for the State of New Jersey as of June 30, 1956. Rental properties situated in Jersey City, which is located in Hudson County, New Jersey, remained subject *274 to rent control in accordance with the local option authority delegated by the Legislature. Such authority to continue rent control was scheduled to terminate on or before December 31, 1957. Rubin and petitioner were aware as early as July of 1956 that rent control for the State of New Jersey had terminated as of June 30, 1956. During 1957 and 1958 petitioner was negotiating for the acquisition of several electrical supply business located in other cities. Following the sale of the apartment building by One Fifteen, petitioner acquired a 40 percent interest in an electrical supply business in Westchester, New York. Petitioner also exchanged 50 percent of the Garfunkel stock to an individual named Edwards in return for a 50 percent interest in a similar business owned by Edwards in New York City. Then petitioner and Edwards each invested in three electrical supply business located in Florida. The reason petitioner decided to have One Fifteen sell the apartment building and then liquidate One Fifteen was a need for additional capital to consummate his planned acquisitions in the electrical supply field. For this reason petitioner insisted that the purchaser pay cash for One Fifteen's *275 equity in the apartment building and that no purchase money mortgage be given for this interest. Of the $77,461.71 received by petitioner on the liquidation of One Fifteen, $40,000 was invested in the Westchester enterprise, with the balance going into the Florida businesses. On his income tax returns for the years 1956, 1957, 1958, and 1960, petitioner reported adjusted gross income of $28,669, $31,545.76, $70,344.18, and $84,904.86, respectively. Petitioner's salary from Garfunkel was $28,600 for each of the 4 years. Petitioner's 1958 income tax return shows total security sales of $774,931.77. Most of the securities sold in 1958 had been purchased in that year. Petitioner's 1960 income tax return shows sales of short-term capital assets of $1,051,671.52, and sales of long-term capital assets of $750,142.59. For 1960 petitioner reported dividend income of $8,402.34, interest income of $8,644.17, and interest expense of $8,359.08. At the time One Fifteen purchased the apartment property, Rubin was informed that during the period from August 6, 1943, to October 1, 1956, while Bellaire owned and operated the property the profits realized from the operation were low. He was informed *276 that the reason for this low profit margin was the existence of rent control in the State of New Jersey. The termination of rent control in Jersey City had a beneficial effect upon the value of rental properties. When One Fifteen conveyed the apartment building to the Crowns on or about August 1, 1958, Rubin was the broker who represented the corporation. Although Rubin had no understanding to that effect, he anticipated that in the event the apartment building was sold by One Fifteen, petitioner would allow him to sell the property. The sale was consummated as a result of Rubin's efforts in acquainting petitioner with the prospective purchasers, the Crowns. The Crowns were relatives of Rubin's. Rubin had attempted to contact petitioner subsequent to the purchase by One Fifteen of the apartment building with respect to other real estate which Rubin considered a good investment but was informed by petitioner that he was too busy with his electrical supply business to consider these properties. The profit realized by One Fifteen on the sale of the apartment building was in part a result of termination of rent control which permitted One Fifteen to increase rental income, and the *277 stable expenses incurred during the period One Fifteen owned and operated the property. Prior to the sale to the Crowns in 1958 petitioner had received offers to sell the apartment building. The first offer was submitted to him less than 1 year after purchase. All these offers were refused by petitioner without investigation or discussion thereof. One Fifteen adopted a plan of complete liquidation on July 16, 1958. The plan authorized the officers and board of directors of the corporation to sell all of the corporate property and distribute the proceeds from the sale to the shareholders. As a result of the sale to the Crowns on August 1, 1958, petitioner, as sole shareholder of One Fifteen, received $77,461.71 as a liquidating dividend, and the gain realized upon the liquidation of One Fifteen was reported by petitioner on his 1958 individual income tax return as an amount received upon the exchange of his One Fifteen stock. Respondent determined that because of the provisions of section 337(c) of the Internal Revenue Code of 1954, One Fifteen was not entitled to claim the nonrecognition of gain benefits of section 337(a), and that accordingly the $56,919 *278 gain realized by One Fifteen on the sale of the apartment building is to be recognized as a long-term capital gain to the corporation and that petitioner is liable as transferee for the deficiency determined against the corporation, plus interest as provided by law. Opinion Section 337(a) of the Internal Revenue Code of 1954 provides that if a corporation adopts a plan of complete liquidation on or after June 22, 1954, and within the 12-month period beginning on the date of the adoption of the plan, all assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. Section 337(c) provides that section 337 shall not apply to any sale or exchange made by a collapsible corporation as defined by section 341(b). Section 341(b)(1) defines as a collapsible corporation, a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the purchase of property described in section 341(b)(3), with a view to the sale or exchange of stock by its *279 shareholders, or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing or purchasing the property of a substantial part of the taxable income to be derived from such property, and the realization by such shareholders of gain attributable to such property. Section 341(b)(3) includes in the property the purchase of which comes within the provisions of section 341(b)(1) (referred to as "Section 341 assets") property described in section 1231(b) without regard to any holding period therein provided, which is property used in the taxpayer's trade or business of a character subject to depreciation. For purposes of applying section 337(c), One Fifteen will be deemed collapsible if it would be collapsible under section 341 had it distributed the apartment building directly to petitioner instead of selling that asset to the Crowns and distributing the proceeds to petitioner. [2]Sproul Realty Co., 38 T.C. 844 (1962). *280 There is no dispute that the apartment building purchased by One Fifteen was property described in section 1231(b), and, therefore, was a section 341 asset as defined in section 341 (b)(3). While petitioner makes some argument to the contrary, we believe under the facts herein it is completely clear that One Fifteen was availed of principally for the purchase of the property which is the section 341 asset. The question is, therefore, whether at the time the apartment building was purchased, One Fifteen had a view to distributing the asset to petitioner before the realization by One Fifteen of a substantial part of the taxable income to be derived from such property, and the realization by petitioner of gain attributable to such property. [3]
*281 Whether One Fifteen (petitioner as its sole stockholder) at the time of purchase of the apartment building had the requisite view is a question of fact to be determined by evaluating the entire record. Petitioner in his testimony stated unequivocally that at the time he purchased the apartment building through One Fifteen he intended to keep it as an investment and it was only in 1958 after he had decided to expand his electrical supply business into New York and Florida through interests in other corporations that he decided to sell the building. He further stated that he was not even considering such an expansion of his electrical supply business until 1957, and, therefore, the reason that he decided to sell the apartment in 1958 had not even been conditionally considered by him in 1956. If petitioner's conclusion as to his intent were required to be accepted in accordance with his statement, disposition of the question here involved could be made on the basis of this testimony of petitioner. However, the requisite view is a subjective state of mind which must be determined through assessing the objective facts. Braunstein v. Commissioner, 305 F. 2d 949 (C.A. 2, 1962), *282 affirming 36 T.C. 22 (1961). There are facts in the record which support respondent's position and facts which support petitioner's position but upon consideration of all these facts the preponderance favors petitioner. Petitioner, prior to the sale in 1958, turned down several offers or inquiries made by people interested in purchasing the apartment building without investigation or discussion of such offers. It was not until he needed additional capital to consummate plans for his electrical supply business acquisitions that he had One Fifteen sell the building. In connection with the sale, petitioner insisted that cash be paid for One Fifteen's equity in the apartment building in lieu of a purchase money mortgage, so that the funds could be put into the electrical supply business ventures. Rubin testified that all of his discussions with petitioner at the time One Fifteen purchased the apartment building were with respect to petitioner's maintaining real estate investments. He performed some of the service with respect to operation of the apartment building without charge in the hope of keeping petitioner as a client for the portfolio of real estate investments. Petitioner's *283 accountant corroborated petitioner's testimony as to the time of the commencement of petitioner's discussions with respect to obtaining interests in electrical supply businesses in New York and Florida. Respondent argues that petitioner had sufficient quick assets in the form of stocks available for use in the acquisition of additional interests in the electrical supply business field so that it was far from necessary for him to liquidate his apartment building investment at the time he did. Petitioner's income tax return for 1958 shows that in that year petitioner had total security purchases and sales of $750,890.13 and $774,931.77, respectively. The timing sequence of the purchases and sales indicates that this volume was not generated solely by a rapid turnover of a small amount of cash. Viewing the schedule of security sales for 1958, it appears that as of May 31, 1958, petitioner held approximately $360,000 either in securities or cash proceeds from the sale of securities. Petitioner also could have held other security investments in 1958 which were not traded. While the record shows that petitioner made substantial stock purchases at approximately the time the apartment building *284 was sold and thereafter during the balance of the year 1958, it also shows a net gain by petitioner from his 1958 stock transactions. The record further shows that petitioner chose to switch his investment in the apartment building to an increased investment in the electrical supply field while maintaining an active position in the stock market, but this is not necessarily an indication that at the time the apartment building was purchased petitioner did not intend to hold it as a long-term investment but was dissuaded from this view by a subsequent need for increased capital in his electrical supply ventures. Respondent argues that the fact that One Fifteen purchased the building at a time when rent controls were being lifted in the State of New Jersey indicates that he intended to sell the building and not hold it as an investment. Petitioner contends that the fact that rent controls were being lifted indicates that rental property was becoming a better investment. The parties suggest as other factors that petitioner's cash investment in the apartment was minimal and no improvements to the property were made, and that petitioner had never dealt in real estate before. We do not *285 feel these factors point particularly in one direction or the other in showing petitioner's investment motive or lack thereof at the time of purchase. Respondent also directs attention to section 341(c) which provides for a presumption in certain cases that the corporation is collapsible. The facts in the instant case are such that the presumption created by section 341(c) is applicable. We feel that the evidence in this case which is sufficient to overcome the presumption of correctness of respondent's determination is also sufficient to rebut the presumption created by section 341(c). Most of the cases cited by respondent deal with corporations organized or availed of for construction of property, the question involved being whether construction had been completed when the view to sell arose. The only case to which our attention has been directed which deals with purchased property as a section 341 asset is Southwest Properties, Inc., 38 T.C. 97 (1962). The corporation involved in that case purchased rental property and sold it about 2 years later to a bank in which two of the three owners of the corporation which purchased the rental property were substantial shareholders *286 and were members of the board of directors. In Southwest Properties, Inc., we held that there was not the requisite view at the time the property was purchased. While there are some differences in the facts surrounding the acquisition and sale of the property in Southwest Properties, Inc., and in the instant case, the similarity of facts in the two is striking. Here as in Southwest Properties, Inc., the preponderance of the evidence is that petitioner had no view to selling the apartment building when One Fifteen acquired it, but it was his subsequent entry into the electrical business in New York and Florida with the resultant need for cash caused his view to change. We hold that One Fifteen is not a collapsible corporation as defined in section 341. Because of an adjustment made in the notice of deficiency to the income of One Fifteen which is not contested, Decision will be entered under Rule 50. Footnotes
1. All Code references herein are to the Internal Revenue Code of 1954.↩
2. Sec. 1.337-1, Income Tax Regs.: "* * * Sales or exchanges made by a collapsible corporation (as defined in section 341(b)) are excluded from the operation of section 337 by section 337(c). Accordingly, section 337 does not apply to any sale or exchange of property whenever the distribution of such property in partial or complete liquidation to the shareholders in lieu of such sale or exchange would have resulted in the taxation of the gain from such distribution in the manner provided in section 341(a) as to any shareholder or would have resulted in the taxation of the gain in such manner, but for the application of section 341(d)↩."
3. Sec. 1.341-2(3), Income Tax Regs.↩ provides, insofar as here pertinent, that a corporation is formed or availed of "if the requisite views existed at any time during the * * * purchase. * * * if the sale * * * is attributable solely to circumstances which arose after the * * * purchase (other than circumstances which reasonably could be anticipated at the time of such * * * purchase) the corporation shall in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of." Both parties rely on this regulation in support of their respective contentions.