Charles **SHILOWITZ** and **Helen Shilowitz**, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

Civ. A. No. 785-61.

United States District Court
D. New Jersey.
Aug. 30, 1963.

180

Hannoch, Weisman, Myers, Stern & Besser, by Irwin I. Kimmelman, Newark, N. J., for plaintiffs.

David M. Satz, Jr., U. S. Atty., Sidney E. Zion, Asst. U. S. Atty., by Herman Wilson, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, David A. Wilson, Jr., Herman Wilson, Attys., Dept. of Justice, Washington, D. C., on the brief), for defendant.

SHAW, District Judge.

Plaintiffs filed an Income Tax Return for the year, 1956, reporting as capital gain an amount of $45,000 derived from the sale of all interest which plaintiff, Charles Shilowitz (hereinafter referred to as "Shilowitz" or "the taxpayer"),[1] held in two corporations. The Commissioner of Internal Revenue determined that this item did not constitute capital

gain and should be treated, for tax purposes, as ordinary income. Accordingly, there was an assessment of alleged tax deficiency in the amount of $18,463.-71,[2] which plaintiffs paid. This action is now brought, pursuant to 28 U.S.C.A. § 1346(a) (1), to recover that amount, with interest, on the ground that it was erroneously assessed and collected. It is conceded that plaintiffs have complied with conditions precedent (26 U.S.C.A. § 7422(a)) to the right to bring this action.

The matter was submitted on Stipulation for disposition by the Court without a trial. The evidence, by Stipulation, consists of certain stipulated facts, testimony taken on depositions, exhibits identified during the course of taking such depositions, and a medical certificate of Dr. Robert Rubenstein.

The pertinent facts, as I find them from the record, may be summarized briefly as follows: On or about March 17, 1955, plaintiff Shilowitz and one Morris Rosenstein entered into an agreement whereby they created two corporations for the purpose of building and owning an apartment-house project known as Harclay House in East Orange, New Jersey. One corporation, Witsor Corp., was to serve as general contractor, and the other, Harclay House, as the project owner. Each of the parties took fifty per cent of the shares of stock in each corporation. No consideration was paid by either party for the stock.

Shilowitz was an experienced architect. Prior to the above-mentioned agreement which he entered upon with Rosenstein, he had completed construction of two apartment-house projects and was completing a third, all of which he held for long-term investment and income purposes and not for sale. He prepared the plans and specifications for the construction of the Harclay House project, obtained an option for purchase of the site, and arranged a commitment for

1. Helen Shilowitz, wife of Charles Shilowitz, is a party solely by reason of the filing of a joint return.

2. Tax in the amount of $15,262.20 plus interest in the amount of $3,201.51.

a conventional construction mortgage from the Brooklyn Savings Bank.

Rosenstein was a retired builder whom Shilowitz had known for a number of years. After Shilowitz had assembled what was described as a "package deal" for the Harclay House project, he approached Rosenstein to induce him to become a partner in the venture because he lacked the funds to undertake it alone and also needed the experience of a builder to supervise the construction. Rosenstein agreed to advance on loan the amount of $150,000 to Harclay House, and it was agreed by the parties that Shilowitz would receive $11,800, as a fee for the preparation of the plans and specifications, to be paid after Rosenstein was reimbursed for the $150,000 advanced and all creditors were paid.

Construction of Harclay House commenced shortly after the execution of the agreement between Shilowitz and Rosenstein and continued without incident until October, 1955, when Shilowitz had a heart attack. Rosenstein supervised construction, and Shilowitz was available for consultation with respect to drawings and specifications and periodic visitation at the job site when problems arose. He also negotiated subcontracts and handled progress payments, using his own office facilities for the work which he performed. As a result of his heart attack, he was confined to the hospital for seven weeks and, thereafter, to his apartment for a period of time with a nurse in attendance. From January, 1956, to March 10, 1956, he was convalescing in Connecticut; part of this time was spent in a wheel chair with a nurse in attendance. The medical certificate of Dr. Robert Rubenstein certified that Shilowitz was under his care for treatment of an acute myocardial infarction and that he had ordered him to "immediately retire from active practice."

Construction continued under the sole supervision of Rosenstein during the illness and convalescence of Shilowitz, and, as it progressed, it developed that the project could not be completed without additional financing. Shilowitz was not in a position to advance funds, and his disability made it impossible for him to contribute the services originally contemplated by the parties. In view of the prospect that Shilowitz would be unable to perform any further work on the project and that the amount of $150,000 advanced by Rosenstein would have to be increased by him to complete construction, Rosenstein decided that he was not willing to continue with the project as a joint venture. It was his position that, if he had to provide financing over the amount of $150,000 to which he had been committed, and also had to assume sole responsibility for the completion of the project without the assistance from Shilowitz, as originally contemplated, he should be the sole owner. With this in mind, he approached Shilowitz and proposed to purchase his entire interest. Shilowitz was not in a position to offer any reasonable objection.

An agreement was reached and formally executed on March 29, 1956, whereby Shilowitz transferred all the shares of stock in Harclay House and Witsor Corp. to Rosenstein and released these corporations from any further claim he might have, including "claim for services as architect for plans, specifications, and supervision." The consideration paid for the transfer of stock and the release embodied in the agreement of March 29, 1956, was $45,000. It may be inferred from the record that thereafter Rosenstein proceeded with the project for the long-term investment purposes that had been contemplated by him and Shilowitz from inception.

The basic questions presented are:

1. Did the total amount of $45,-000 which Rosenstein paid to Shilowitz include compensation for the preparation of plans and specifications which would be taxable as ordinary income?

2. Is gain realized by Shilowitz from consideration paid for the sale of his stock gain attributable to the sale of stock of collapsible corporations?

■■ Where it may be reasonably inferred from the evidence that consideration allegedly paid for the sale or transfer of stock included compensation for services rendered, the Court may determine on findings of fact from such evidence how much of the total consideration paid, as contemplated by the parties, represented payment for the purchase of stock as distinguished from payment for personal services. Roscoe v. Commissioner, 215 F.2d 478 (5th Cir.1954); Lewis v. Commissioner, 19 T.C. 887 (1953). The nature of a right that is relinquished by release is determinative of the purpose for which the consideration was paid and will be classified accordingly for tax purposes. Commissioner v. Murdoch, 318 F.2d 414 (3rd Cir. 1963).

■ As noted above, the agreement which Shilowitz entered upon with Rosenstein, dated March 29, 1956, pursuant to which the amount of $45,000 was paid to Shilowitz, recites that he "will execute and deliver to Harclay House and Witsor Corp. a release releasing the said corporations of any claim of any nature that he may have with respect to the said two corporations including any claim for services as architect for plans, specifications, and supervision." In the basic agreement, the value of his services for the preparation of plans and specifications was fixed at the sum of $11,800. There is no dispute about the fact that he relinquished any right that he had to be reimbursed for his services in preparation of these plans and specifications and that Rosenstein contemplated, in his agreement to pay the sum of $45,000, that payment thereof included compensation to Shilowitz for the preparation of plans and specifications.

Accordingly, it is the opinion of the Court that, of the total sum of $45,000 paid to Shilowitz, $11,800 represented payment for personal services and is taxable as ordinary income, and that the remaining part of the consideration represented payment for the shares of stock sold.

The question of whether the gain in the amount of $33,200 attributable to the sale of stock is taxable as ordinary income involves the application of the "collapsible corporation" provisions of Section 341 of the Internal Revenue Code of 1954.[3]

Gain attributable to the sale of stock of a collapsible corporation is considered as gain from the sale of property which is not a capital asset and is taxable as ordinary income. A collapsible corporation is one that is formed or availed of for the construction of property with a view to gain from the sale of the corporate stock before a substantial part of taxable income is realized from the property.

---

3. Section 341 was preceded in substantially the same form by section 117(m) of the Internal Revenue Code of 1939 and was amended by the Technical Amendments Act of 1958, § 20(a), 72 Stat. 1615, and by the Act of October 16, 1962, § 13(f) (4), 76 Stat. 1035. It provided in pertinent part:

"(a) *Treatment of gain to shareholders.*—Gain from—

"(1) the sale or exchange of stock of a collapsible corporation, * * * to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall * * * be considered as gain from the sale or exchange of property which is not a capital asset.

"(b) *Definitions.*—

"(1) *Collapsible corporation.*—For purposes of this section the term 'collapsible corporation means a corporation formed or availed of principally for the * * * construction * * * of property [and] * * * so formed or availed of, with a view to—

"(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation * * * constructing * * * the property of a substantial part of the taxable income to be derived from such property, and

"(B) the realization by such shareholders of gain attributable to such property."

The corporation [4] (referring to both corporations) was formed and availed of for the construction of property. Gain from the sale of stock was realized by the taxpayer before the construction was completed and before any taxable income was realized from the property. If the corporate device in this instance was used with a view to such gain at the time it was set up or at any time during the construction, the corporation would be collapsible, and the gain must be treated as ordinary income. Hence, the pertinent question is whether the requisite view on the part of the taxpayer ever existed, [5] and resolution of this question determines whether the gain from the sale of the corporate stock is taxable as capital gain or ordinary income. Braunstein v. Commissioner, 305 F.2d 949 (2d Cir.1962), aff'd 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963) [6]; Mintz v. Commissioner, 284 F.2d 554 (2d Cir.1960); Jacobson v. Commissioner, 281 F.2d 703 (3rd Cir.1960); August v. Commissioner, 267 F.2d 829 (3rd Cir.1959); Glickman v. Commissioner, 256 F.2d 108 (2d Cir.1958); Elliott v. Commissioner, 205 F.Supp. 384 (D.C.Ore., 1962); Temkin v. Commissioner, 35 T.C. 906 (1961); Abbott v. Commissioner, 28 T.C. 795 (1957), aff'd 258 F.2d 537 (3rd Cir. 1958).

There is no evidence from which it may reasonably be inferred that the sale of stock by Shilowitz was motivated by any circumstance other than his heart attack which caused Rosenstein to insist that he withdraw from the joint venture. Indeed, the defendant does not argue to the contrary. The crux of defendant's argument is that the sale of the stock, induced by circumstances present during the course of construction, occurred before construction was completed and must, therefore, be considered in a different light than if the sale, as a result of the same circumstances (present at the time of construction), occurred after completion of construction. The gist of the argument is that the language of Section 1.341-2(a) (3), relating to a sale of stock attributable to circumstances present at the time of construction,[7] is not applicable where the same takes place during construction. I can-

---

4. Under the liberal interpretation given the term "construction," both corporations are subject to the provisions of Section 341(b). See Farber v. Commissioner, 36 T.C. 1142 (1961); Sterner v. Commissioner, 32 T.C. 1144 (1959); and Weil v. Commissioner, 28 T.C. 809 (1957).

5. *Treasury Regulations*, § 1.341-2:
   "(3) A corporation is formed or availed of with a view to the action described in section 341(b) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of." As to effect to be given to Treasury Regulations, see Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938); J. G. Boswell Co. v. Commissioner, 302 F.2d 682 (9th Cir., 1962).

6. Review limited to the question: "Whether Section 117(m) of the Internal Revenue Code of 1939, which provides that gain 'from the sale or exchange * * * of stock of a collapsible corporation' is taxable as ordinary income rather than capital gain, is inapplicable in circumstances where the stockholders would have been entitled to capital gains treatment had they conducted the enterprise in their individual capacities without utilizing a corporation."

7. § 1.341-2(a) (3): "* * * However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of."

not agree that the Regulation lends itself to the construction urged by defendant. The Regulation makes a distinction between a sale "attributable solely to circumstances which arose * * * after construction" and a sale "attributable to circumstances present at the time of * * * construction." A reasonable interpretation would not indicate that a further distinction was intended based solely upon the time when the sale was consummated. In fact, it is difficult to conceive how, in rational application of the Regulation, the time element of the sale of stock, standing alone and apart from circumstances inducing it, could be considered a determining factor in whether gain realized should be treated as capital gain or ordinary income. See Lowery v. Commissioner, 39 T.C. 959 (1963).

■ Where the sale of the stock is attributable to circumstances present at the time of construction, as is the case here, it will be deemed, in the absence of compelling facts to the contrary, to be a sale of stock of a collapsible corporation within the contemplation of the applicable provisions of Section 341 of the Internal Revenue Code of 1954, and the burden rests upon the taxpayer to establish such facts to refute the existence of the prescribed statutory view. Arkhola Sand & Gravel Company v. United States, 190 F.Supp. 29 (W.D.Ark.1960).

The only reasonable inference that may be drawn from the affirmative proofs is that the two corporations were not formed or availed of with a view, on the part of either Rosenstein or Shilowitz, to the sale of the corporate stock before realization of substantial taxable income to be derived from the property. There is no evidence that such action on the part of either was contemplated "unconditionally, conditionally, or as a recognized possibility."[8] A long-term investment in income-producing property was the objective. The achievement thereof on the part of Shilowitz was frustrated by his heart attack, and his withdrawal from the joint venture by sale of his stock was an involuntary consequence of unforeseen circumstances over which he had no control. The fact that he did dispose of his stock at a gain, under the compulsion of such circumstances, is not inconsistent, as defendant urges, with the absence of the prescribed statutory view.

The test is whether unforeseen circumstances which could not have been reasonably anticipated were the sole producing cause of change of plan. In Braunstein v. Commissioner, supra, 305 F.2d at page 955 it was stated by the Circuit Court that:

"Were the courts to permit any minor adversity to serve as the pretext for a *previously contemplated disposition*, the collapsible corporation provision would indeed have a narrow scope. *Thus, we must distinguish between those events which truly motivate a change in existing plans and those which merely operate as a trigger*." (Emphasis supplied.)

■ I conclude here that the taxpayer did not contemplate sale of his stock prior to realization of substantial taxable income from the apartment-house project until after his heart attack and that his decision to sell then was not a matter of deliberate choice in furtherance of a previously formed or considered view. Accordingly, I conclude that the prerequisite statutory view was not present for the purpose of treating the gain from the sale of stock as ordinary income and that the amount of $33,200 realized as gain should be taxed as capital gain.

An appropriate order for entry of judgment in accordance herewith will be submitted.

8. Treasury Regulations, § 1,341–2(2).