MAX N. TOBIAS AND MILDRED G. TOBIAS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88979. Filed April 22, 1963

*E. Charles Eichenbaum,* and *W. S. Miller, Jr.,* for the petitioners. *J. C. Linge,* for the respondent.

86

88

**92**

OPINION

BLACK, *Judge:*

### Issue 1

### *Involuntary Conversion of Property*

Petitioner received $213,790.32 in 1954 as reimbursement under a fire insurance policy paid because of damaged and destroyed machinery and equipment located in a building owned by him. Petitioner purchased the building on or about February 1, 1949, and he

leased it to Gibbons, a corporation in which he is controlling stockholder, for a term of 10 years on February 1, 1949, later changed to 20 years. Petitioner retained $207,706.77 of the insurance proceeds and paid Gibbons the amount of $6,083.55.

From February 1, 1949, to May 11, 1953, Gibbons purchased machinery and equipment for which it paid the amount of $115,011.87. The fire which caused a loss of approximately 40 percent of the machinery and equipment occurred on May 11, 1953. Fire insurance premiums were paid for by the lessee insuring jointly the interests of the lessor and lessee in the machinery and equipment.

Petitioner contends that under the terms of the lease between petitioner and Gibbons all the machinery and equipment placed in the building by the corporate lessee became petitioner's property at the time it was installed, that he is entitled to all of the insurance proceeds, and that any gain to him is taxable at capital gain rates. Respondent contends that petitioner should report as a dividend taxable at ordinary income tax rates the proceeds he received in 1954 in the amount of $207,706.77 on the ground that the destroyed and damaged machinery and equipment in fact belonged to the lessee.

Petitioner reported the insurance payments as long-term capital gains in 1955 but now concedes that they are reportable in the year received, 1954. There is now no dispute as to the amount or year of payment or that petitioner personally received all of the proceeds except for $6,083.55. There is no dispute as to the payments collected by petitioner on his loss on the building itself. Petitioner has not replaced the damaged or destroyed machinery and equipment.

The questions presented are whether the additions of machinery and equipment made by the lessee during the term of the lease were the property of the lessor when they were destroyed by fire and, if so, what amount of the insurance proceeds collected by petitioner represented a reimbursement for his property. If the machinery and equipment added by the lessee to the building were not the property of the lessor but were in fact the property of the lessee, as respondent contends, then the insurance proceeds collected by petitioner, respondent contends, represent a constructive dividend to petitioner.

In 1938 the Supreme Court held that a lessor does not realize taxable income when a lessee makes improvements to the leasehold, *M. E. Blatt Co.* v. *United States*, 305 U.S. 267 (1938). In that case the Supreme Court concluded that:

It may be assumed that, subject to the lease, lessor became owner of the improvements at the time they were made. But it had no right to use or dispose of them during the term. Mere acquisition of that sort did not amount to contemporaneous realization of gain within the meaning of the statute.

Two years later in *Helvering* v. *Bruun*, 309 U.S. 461 (1940), the Supreme Court modified the *Blatt* decision and determined that the

lessor could derive income due to the improvements made during the lease at the *termination* of the lease. Congress, however, soon thereafter amended the law to exclude from the gross income of the lessor income attributable to the improvements made by the lessee. The congressional reports make it clear that section 115 of the Revenue Act of 1942 was designed to overrule the *Bruun* decision.[1] Section 115 of the Revenue Act of 1942 became section 22(b)(11) of the 1939 Code, as amended, and section 109 [2] of the 1954 Code is substantially identical with section 22(b)(11). Accordingly, if we find that the machinery and equipment constitute "other improvements" as that phrase is used in section 109 of the 1954 Code and that they became the lessor's property under the lease, then the value of the improvements is not included in the gross income of the lessor and fire insurance proceeds paid on account of the involuntary conversion of that property belong to him. The terms of the lease set forth in our Findings of Fact make it clear, we think, that the machinery and equipment became the property of the lessor.

It seems apparent to us that the phrase "other improvements" as it is used in section 109 has application to permanent additions of value to real property. The additions of machinery and equipment made by the lessee in this case seem to fall within that definition. Most of the equipment was heavy and large and it appears that most of it was physically attached to the realty. The equipment was also necessary for the manufacturing process carried on in the building. As a general rule, under the law of fixtures, manufacturing equipment becomes part of the real property if the lessor and lessee so intend and where the equipment is needed in the manufacturing process carried on on the leasehold.[3]

We conclude that the machinery and equipment installed by the lessee constituted "other improvements" within the meaning of section 109 of the 1954 Code. Therefore, it appears that section 109 is applicable here.

Finding that the lease between petitioner and his corporation was a bona fide lease arrived at at arm's length, our decision in *Owen Meredith*, 12 T.C. 344 (1949), is of particular note. In that case we held that the proceeds of fire insurance policies paid for by the lessee, covering improvements placed on the property by the lessee under a lease agreement which gave the lessor ownership of the improvements, were taxable to the lessor at capital gains rates. The following portions of that opinion are particularly relevant here:

---

[1] H. Rept. No. 2333, 77th Cong., 2d Sess., p. 69 (1942), 1942–2 C.B. 425 ; S. Rept. No. 1631, 77th Cong., 2d Sess., p. 79 (1942), 1942–2 C.B. 564.

[2] SEC. 109. IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY.

Gross income does not include income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.

[3] V American Law of Property, secs. 19.1–19.8, 19.13, and 19.14 (1952).

There can be no question but that under the lease agreement the petitioner became the owner of the improvements at the time they were placed on the property. The only interest which the lessee had in them was the right to their use during the term of the lease. The cancellation of the lease immediately cut off that interest. At best, the lessee's interest in the insurance proceeds gave it no more than a bargaining power in the negotiations for cancellation of the lease. It could forego its right under the lease agreement to the use of the insurance proceeds to replace the improvements in consideration for release from its obligation to pay rent for the remainder of the lease term. * * * We can not find on the evidence before us that the insurance proceeds were in fact received by petitioner, to any extent, as consideration for cancellation of the lease.

Even if the lessee had continued the lease and had been permitted to use the funds to replace the improvements, the converted fund in the form of new improvements would still have been the property of the lessor. Thus, it would seem that the petitioner was actually the equitable, as well as the legal, owner of the improvements and the insurance proceeds.

\*     \*     \*     \*     \*     \*     \*

The petitioner did not receive the insurance money as rent. He received it as compensation for his loss of the improvements which had already become his property. * * *

It might be noted that under section 112(f), Internal Revenue Code, the petitioner would not have been taxable on the receipt of the insurance proceeds if he had permitted their use for replacing the improvements; nor under section 22(b)(11), Internal Revenue Code, would he have been taxable on any gain from the acquisition of the improvements if they had not been destroyed and had remained on the premises until the termination of the lease. His gain would have been taxable when he sold or otherwise disposed of the property, presumably at the capital gain rates.

We reach the same conclusion here under the 1954 Code as was reached above and find that the insurance payments for the destroyed and damaged improvements are taxable as long-term capital gain to petitioner.

A portion of the fire insurance proceeds collected by petitioner, however, was not reimbursements for the loss of petitioner's property. The record shows that petitioner received some of the insurance payments that should have gone, we think, to Gibbons under the policy. These payments were for (1) engineering fees, (2) tools, supplies, and spare parts, and (3) difference in salvage, scrap, and dismantling and removal of debris in the respective amounts of $12,504.02, $20,000, and $6,097, less 10 percent for the coinsurance provision. The insurance payments made for these items were, we think, clearly not for improvements owned by the lessor. Accordingly, they should have been collected by Gibbons and the amount of $34,740.92 constituted a constructive dividend to petitioner in 1954, taxable at ordinary rates. Gibbons' earnings and profits were more than sufficient to cover this dividend. The remainder ($207,706.77 less $34,740.92, or $172,965.85) represents a payment to petitioner for his property. Since both the damaged and undamaged machinery and equipment owned by peti-

tioner were subsequently sold, we can assume that petitioner first recovered his entire adjusted basis of $21,469.35 from the fire insurance payments and his capital gain in 1954 was $151,496.50, giving him a zero basis in all the remaining machinery and equipment.

## Issue 2

### Additional Long-term Capital Gains

After the fire and after the parties agreed to cancel the lease, petitioner claims that he entered into an oral agreement with Gibbons whereby Gibbons would sell all the machinery and equipment owned by petitioner, whether damaged by fire or not, and Gibbons would keep the proceeds from the sale of the machinery and equipment it had purchased. We do not believe there is sufficient evidence to find that a valid agreement was made between petitioner and Gibbons to that effect. Petitioner has previously shown that this was his property and he now takes an inconsistent position. Accordingly, we find that the proceeds of the sale of petitioner's machinery and equipment should have been reported by him as his gain.

We have set forth in detail in our Findings of Fact the amount of proceeds from these sales which should have been reported by petitioner in the years 1954, 1955, and 1956 as additional long-term capital gains and we do not feel it necessary to review those findings here. As we noted earlier, petitioner recouped his entire adjusted basis in this machinery and equipment from the insurance payments so his adjusted basis in this machinery and equipment was zero and the total sales proceeds are additional long-term capital gains to him.

## Issue 3

### Collapsible Corporation

This issue involves the question of whether the Future Realty Corp. was a collapsible corporation within the meaning of section 341 of the 1954 Code.[4]

---

[4] SEC. 341. COLLAPSIBLE CORPORATIONS.
  (a) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from—
    (1) the sale or exchange of stock of a collapsible corporation,

    \*     \*     \*     \*     \*     \*     \*

to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as provided in subsection (d), be considered as gain from the sale or exchange of property which is not a capital asset.
  (b) DEFINITIONS.—
    (1) COLLAPSIBLE CORPORATION.—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—
      (A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corpo-

Petitioner contends that Future was not a collapsible corporation because (1) the stockholders did not have the required "view," (2) the property was not a section 341 asset, and (3) if the corporation is collapsible, the decision in *United States* v. *Ivey*, 294 F. 2d 799 (C.A. 5, 1961), petition for rehearing denied 303 F. 2d 109 (1962), is applicable.

Respondent contends that Future was a collapsible corporation and also contends that there is a statutory presumption that Future was a collapsible corporation. As to the statutory presumption, the facts show that the asset involved, real estate, was far in excess of 50 percent of the fair market value of Future's total assets. The adjusted cost basis of the land was $350,250 and the amount paid for all of the Future capital stock on September 21, 1954, was $625,500. The value of the land and improvements was more than 120 percent of the adjusted basis of $350,250. It appears, therefore, that the provisions of

ration manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization by such shareholders of gain attributable to such property.

(2) PRODUCTION OR PURCHASE OF PROPERTY.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property if—

(A) it engaged in the manufacture, construction, or production of such property to any extent.

(B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or

(C) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation.

(3) SECTION 341 ASSETS.—For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is—

(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year;

(B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business;

(C) unrealized receivables or fees, except receivables from sales of property other than property described in this paragraph; or

(D) property described in section 1231(b) (without regard to any holding period therein provided), except such property which is or has been used in connection with the manufacture, construction, production, or sale of property described in subparagraph (A) or (B).

In determining whether the 3-year holding period specified in this paragraph has been satisfied, section 1223 shall apply, but no such period shall be deemed to begin before the completion of the manufacture, construction, production, or purchase.

\*        \*        \*        \*        \*        \*        \*

(d) LIMITATIONS ON APPLICATION OF SECTION.—In the case of gain realized by a shareholder with respect to his stock in a collapsible corporation, this section shall not apply—

(1) unless, at any time after the commencement of the manufacture, construction, or production of the property, or at the time of the purchase of the property described in subsection (b)(3) or at any time thereafter, such shareholder (A) owned (or was considered as owning) more than 5 percent in value of the outstanding stock of the corporation, or (B) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 5 percent in value of the outstanding stock of the corporation;

(2) to the gain recognized during a taxable year, unless more than 70 percent of such gain is attributable to the property so manufactured, constructed, produced, or purchased; \* \* \*

section 341(c)[5] have been met. There was also a sale of stock since it is stipulated that the option to purchase Future's stock was exercised on September 21, 1954.

The property involved would be a "section 341 asset" if it was either held by Future primarily for sale to customers in the ordinary course of business, section 341(b)(3)(B), *supra*, or if the property falls within the description set forth in section 1231(b),[6] section 341(b)(3)(D), *supra*. It seems apparent that the property in question is property described in section 1231(b) since it was real estate used in Future's trade or business of renting real estate.

The next question is whether the stockholders sold their stock before Future realized a substantial part of the taxable income to be derived from the property. Future had realized $45,000 in rentals when the stock option was exercised by Magnolia. Under the 10-year lease with Magnolia it would have realized $476,250 in rentals. We find that it was reasonable to expect that Future would realize at least $476,250 from the real estate through rentals. Consequently, it is apparent that the amount of realized income at the time of the sale was not substantial so as to take the transaction outside the scope of section 341(b)(1)(A), *supra*; cf. *Heft* v. *Commissioner*, 294 F. 2d 795 (C.A. 5, 1961), affirming 34 T.C. 86 (1960), and *Rose Sidney*, 30 T.C. 1155 (1958), affd. 273 F. 2d 928 (C.A. 2, 1960).

The next question is whether Future was formed or availed of with a view to sell the stock before the realization of a substantial part of the taxable income to be derived therefrom.

---

[5](c) PRESUMPTION IN CERTAIN CASES.—

(1) IN GENERAL.—For purposes of this section, a corporation shall, unless shown to the contrary, be deemed to be a collapsible corporation if (at the time of the sale or exchange, or the distribution, described in subsection (a)) the fair market value of its section 341 assets (as defined in subsection (b)(3)) is—

(A) 50 percent or more of the fair market value of its total assets, and

(B) 120 percent or more of the adjusted basis of such section 341 assets.

Absence of the conditions described in subparagraphs (A) and (B) shall not give rise to a presumption that the corporation was not a collapsible corporation.

(2) DETERMINATION OF TOTAL ASSETS.—In determining the fair market value of the total assets of a corporation for purposes of paragraph (1)(A), there shall not be taken into account—

(A) cash,

(B) obligations which are capital assets in the hands of the corporation (and governmental obligations described in section 1221(5)), and

(C) stock in any other corporation.

[6] SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

In June 1953 the Future stockholders were considering leasing property and giving an option to sell their stock. The group that became the Future stockholders at that time caused Marvin to be created to secure an option on the 136 acres that Magnolia did not want. The facts show that Future intended to lease 427 acres to Magnolia and became bound to do so on July 24, 1953. Magnolia could not have entered into any agreement prior to July 16, 1953, the date it was incorporated.

The Future stockholders knew exactly what was going to be done sometime in June or July of 1953. If they had not intended to sell their stock at that time there would have been no need for creating Marvin since Future could have acquired the 563 acres and leased all or any part of the tract. Future did not exercise its option to purchase the real property until the same date that it entered into the lease agreement with Magnolia and the Future stockholders granted an option to purchase all of the Future stock. Doubtless Magnolia would not have leased the 427 acres had it not acquired an option to purchase the property or all of the Future stock. We believe the conclusion is inescapable that Future stockholders knew that either the property or their stock would be sold at the time Future purchased the property. This evidence clearly shows that Future was formed or availed of with the "view" on the part of the stockholders to sell their stock before Future realized a substantial part of the income to be derived from the property, cf. *Raymond G. Burge*, 28 T.C. 246 (1957), affd. 253 F. 2d 765 (C.A. 4, 1958); *Elizabeth M. August*, 30 T.C. 969 (1958), affd. 267 F. 2d 829 (C.A. 3, 1959); and *C. D. Spangler*, 32 T.C. 782 (1959), affd. 278 F. 2d 665 (C.A. 4, 1960), certiorari denied 364 U.S. 825 (1960).

It is further stipulated that petitioner owned 25 percent of the Future capital stock at all times from the date Future was formed until the stockholders sold their stock to Magnolia on September 21, 1954. The evidence also shows that the entire gain involved in this issue was attributable to the real estate acquired on September 21, 1953. Therefore, the requirements of section 341(d), *supra*, have been met.

Our analysis set forth above, we think, shows that the corporation was collapsible under all the tests within section 341.

Petitioner contends, however, that another reason remains why petitioner is entitled to capital gain treatment on the sale of his stock. Petitioner argues that under the Fifth Circuit's decision in *United States* v. *Ivey*, *supra*, collapsible corporation treatment should not apply to tax a shareholder's gain as ordinary income where such gain would have been taxed as capital gain if the corporate form had not been utilized. If we assume, without deciding, that the facts in the instant case fall into that exception, we would still feel compelled to refuse to follow that decision. The Tax Court has expressly refused

100

to adopt the principles of *United States* v. *Ivey, supra;* see *Sproul Realty Co.*, 38 T.C. 844 (1962). The argument was also rejected by the Second Circuit in *Braunstein* v. *Commissioner*, 305 F. 2d 949 (C.A. 2, 1962), affirming 36 T.C. 22 (1961), certiorari granted December 10, 1962, and that case is now before the Supreme Court. We follow our decision in *Sproul Realty Co., supra,* in the instant case with all due respect to the Fifth Circuit in *United States* v. *Ivey, supra.*

We conclude, therefore, that Future was a collapsible corporation and that petitioner's gains in 1954 and 1955 from the sale of his stock in Future, as stipulated, should be considered as gains from the sale of property which is not a capital asset. On this issue we hold for the respondent.

*Decision will be entered under Rule 50.*