GUY A. VAN HEUSDEN, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF E. J. VAN HEUSDEN, DECEASED, TRANSFEREE, MELANIE VAN HEUSDEN, EXECUTRIX, AND TITLE INSURANCE AND TRUST COMPANY, AS SPECIAL ADMINISTRATOR, AND APPLICANT FOR LETTERS OF GENERAL ADMINISTRATION AS SUCCESSOR EXECUTOR TO MELANIE VAN HEUSDEN, EXECUTRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2358–63, 2357–63.   Filed June 28, 1965.

*Samuel J. Foosaner*, for the petitioners.
*John J. Hopkins* and *Julius M. Jacobs*, for the respondent.

TRAIN, *Judge:* Respondent has asserted that petitioners are liable as transferees of West Cocoa Acres, Inc., for a deficiency in the latter's 1958 income taxes in the amount of $65,668.01. Since petitioners have conceded that they are liable as transferees for any deficiency, the issue for our decision is whether there is any underlying deficiency. This depends upon whether or not West Cocoa Acres, Inc., was a collapsible corporation within the definition of section 341 of the 1954 Code [1] so as to render inapplicable the nonrecognition provisions of section 337.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Guy A. Van Heusden (sometimes hereinafter referred to as petitioner) is a resident of Melbourne, Fla. E. J. Van Heusden, petitioner's father, died a resident of Altadena, Calif., on February 17, 1961. Title Insurance & Trust Co. of California is the duly appointed executor of his estate. Petitioner and his father will sometimes hereinafter be referred to as petitioners.

On October 11, 1957, West Cocoa Acres, Inc. (sometimes hereinafter referred to as the corporation), was organized in Brevard County, Fla.; its certificate of incorporation was filed with the secretary of state of Florida on October 17, 1957. Petitioners were the sole owners of the stock of the corporation.

On March 12, 1959, the corporation filed with the district director of internal revenue at Jacksonville, Fla., its Federal income tax return for 1958 showing no taxable income. Schedule D of the return disclosed the acquisition by the corporation of 760 acres of land on October 11, 1957, at a cost of $231,773.09, sale thereof on May 16, 1958, for $418,000, and sales expenses with respect thereto of $56,-208.43. A long-term capital gain of $130,018.48 was claimed to be nontaxable, the claim being accompanied by the following explanation:

Corporation has been liquidated pursuant to Section 337 of the 1954 Internal Revenue Code. All assets, inclusive of proceeds of sale, have been distributed to shareholders in exchange for their stock. Transaction is reflected for informational purposes only since gain is chargeable to stockholders and not to the corporation.

Petitioner, an engineer employed by North American Aviation Co. (hereinafter sometimes referred to as Aviation), first took up residence in Brevard County, Fla., in 1952 when he was transferred by Aviation from its California office to its office at Patrick Air Force Base in Brevard County, Fla. The transfer was in connection with the establishment at Cape Canaveral (now known as Cape Kennedy) of testing facilities to flight-test the missiles which Aviation was building for the Government under the Navajo program.

Due to the rapid advance in missile technology, the Navajo program became obsolete and the Government canceled it in July 1957. Aviation began reducing its Florida staff and finally recalled the remaining employees to California. Petitioner left the employ of Aviation at the end of August 1957 but chose to stay in Brevard County, Fla., to participate in the area's economic growth attributable in large part to space activities at Cape Canaveral.

For several years before he left Aviation, petitioner had entered into several real estate transactions, as shown in the following table:

| Property involved | Date acquired | Cost of entire property | Date sold | Sale price of entire property | Petitioner's share of profit (loss) |
|---|---|---|---|---|---|
| Vacant lot | May 1955 | $1,000.00 | June 1956 | $1,000.00 | ($171.62) |
| ½ interest in 540 acres | July 1, 1955 | 176,160.05 | Feb. 1, 1956 | 422,280.00 | 64,428.68 |
| 410 acres | Oct. 1956 | 93,304.16 | Dec. 1956 | 143,500.00 | 49,211.69 |
| Vacant land | Mar. 5, 1957 | 31,075.75 | Sept. 10, 1957 | 45,000.00 | 9,261.60 |
| ½ interest in 180 acres [1] | Oct. 12, 1956 | 66,100.00 | May 17, 1957 | 102,158.65 | 25,620.49 |
| ⅗ interest in 80 acres [1] | Nov. 12, 1956 | 26,000.00 | May 17, 1957 | 45,403.85 | 14,764.66 |
| Land deposit | | 1,000.00 | Dec. 9, 1957 | None | (1,000.00) |

[1] The remaining interests in these parcels were owned by petitioner's father. The parcels were assembled and sold together.

Petitioner's biggest real estate venture during this 1955–58 period occurred soon after he left Aviation in 1957, when he contracted to purchase a 760-acre tract (sometimes hereinafter referred to as the El Pico tract) for $215,000. He then assigned the contract to the corporation. The corporation consummated the purchase of the land and then sold it in 1958 for $418,000. The instant case centers around this transaction, the details of which are more fully set forth in subsequent findings of fact.

At the time he left Aviation in August 1957, petitioner, together with his former supervisor and two former fellow employees, planned to develop a shopping center; but nothing came of it because of the complexity of the undertaking. Sometime later, at the end of 1957 or early in 1958, the four formed and operated the Continental Development Corp., which designed and built homes on single lots in established communities, and sold them to homebuyers. Prior to this venture, petitioner's first income-producing activity after leaving Aviation was with Atlantic Construction Co. which he and another person organized, and owned equally. They engaged in the general contracting business—submitting bids for the erection of homes and, in some instances, for the erection of stores on land owned by others.

Petitioner first became interested in the 760-acre El Pico tract some months before he left Aviation when he read in the newspapers that a 20,700-acre tract owned by Hotchkiss and Kislak was being subdivided into smaller units. This 20,700-acre parcel was located almost in the center of Brevard County, and the El Pico tract was situated in the most desirable part of that parcel.

Petitioner conducted his negotiations with Hotchkiss and Kislak through John J. Kabboord (sometimes hereinafter referred to as Kabboord), a local real estate broker whom he knew for many years and with whom he had previous real estate transactions. The negotiations culminated in two contracts between petitioner and El

Pico Investment Corp. (a Hotchkiss and Kislak company) for the purchase by petitioner of the El Pico tract, consisting of two contiguous parcels of 280 acres and 480 acres. The two contracts are sometimes hereinafter referred to as the El Pico contract.

The El Pico contract was signed September 3, 1957, a few days after petitioner left Aviation. It provided for a purchase price of $215,000, payable $30,000 in cash on signing of contract, and by delivery of a $185,000 promissory note, secured by a purchase money mortgage, which was to be paid in installments. Supplemental agreements with regard to the El Pico contract were executed on October 26, 1957, but they did not change the substance of the transaction.

Although the custom and usage in Brevard County required the seller to pay a 10-percent brokerage commission, the El Pico contract provided that "The parties agree that Ocean Realty, Inc. * * * was the real estate broker who negotiated this agreement; and the Buyer agrees to pay said broker the real estate broker's commission due said broker in accordance with agreement this day made by Buyer with said broker." The seller insisted on this provision and was willing to make a compensating adjustment in the purchase price; and petitioner was willing to accept it, provided it resulted in no overall increase in price and required no greater outlay in cash than he originally intended. The final contract provisions took these factors into consideration.

Kabboord carried on his brokerage business as Ocean Realty, Inc. The brokerage commission agreement between him and petitioner, referred to in the El Pico contract, was an oral one, the substance of which was that Kabboord was to receive $10,750 (5 percent of the purchase price) out of the proceeds from the resale of any portion or subdivision of the El Pico tract, plus an additional 5 percent of any profits realized on such sales or minus 5 percent of any losses sustained on such sales. The precise method of securing the payments of this commission arrangement was left for later determination.

About 3 weeks after the El Pico contract was signed, a salesman for Ocean Realty, Inc., entered into negotiations (with petitioner's knowledge and approval) for the sale of the El Pico tract. By the end of September or the beginning of October 1957, the negotiations had reached a satisfactory stage and petitioner consulted with his real estate counsel, Edward L. Trader of Melbourne, Fla. (sometimes hereinafter referred to as Trader), and with his New Jersey tax counsel with respect thereto.

As a result of these consultations, petitioner had Trader organize the corporation, with nominee incorporators and officers (consisting of Trader, his secretary, and Kabboord), to which he assigned the El Pico contract. The organization of the corporation and the assignment both took place on October 11, 1957.

That same day the corporation, by Trader, its president, entered into two contracts for the sale of the El Pico tract to Ann L. Krohne, who was the nominee of a Palm Beach, Fla., purchasing syndicate, for $418,000. Ocean Realty, Inc., was named the broker in the transaction and was to receive a commission of $41,800 (10 percent of the purchase price) from the corporation, as seller. The closing date was set for some time between May 1 and May 15, 1958.

On November 1, 1957, petitioner held a conference at Trader's office in Melbourne, Fla., with his tax attorney and Trader concerning the formation of the corporation, the implementation of the brokerage commission agreement on the El Pico transaction, and the consummation of the El Pico and Krohne contracts.

Petitioner's tax attorney drafted a memorandum of the conference which he sent to his law partner in New Jersey together with a letter reflecting the decisions reached. The letter stated in part:

All of the foregoing is to be done by us in contemplating [sic] of keeping consistent record with a view to a subsequent plan of liquidation, and the liquidation of the corporation to be along the lines which we discussed with Van on his recent trip to Newark. * * *

Petitioner's trip to Newark, referred to in this letter, took place prior to the purchase of the El Pico tract.

The November 1, 1957, meeting was recorded as a special meeting of the corporation's board of directors. The minutes thereof contained a discussion of the desirability of taking the assignment of the El Pico contract, a resolution to accept the assignment of that contract, a discussion of the details of the brokerage commission on the El Pico transaction, a resolution to assume petitioner's obligation to pay that brokerage commission, and a resolution ratifying and approving the Krohne contracts and the authority of Trader to execute the Krohne contracts as president of the corporation.

On November 15, 1957, the board of directors passed a resolution approving the corporation's purchase of the El Pico tract and authorizing the president and secretary to execute the purchase money mortgage and to do all other acts necessary to consummate the El Pico transaction.

On May 2, 1958, the board of directors passed a resolution adopting a plan for the liquidation of the corporation and for the distribution to its stockholders of all its assets, including the proceeds from the sale of the El Pico tract under the Krohne contract, after paying its "remaining liabilities and expenses incidental to such sale." The same day the plan of liquidation was ratified and approved by the stockholders of the corporation.

The closing of the Krohne agreement of October 11, 1957, took place on May 16, 1958. The Krohne promissory note and purchase money mortgage, received at the closing, were placed in escrow with a

bank with instructions to apply the proceeds towards the payment of the commissions still due Kabboord and, after paying out such other corporate obligations as petitioner might direct, to turn over the balance to petitioners by depositing equal amounts thereof to their respectively designated bank accounts.

Between the dates of its organization in October 1957 and its liquidation in December 1958, the corporation opened its own bank account into which its receipts were deposited and from which its various disbursements were made. When the corporation was liquidated it paid the remaining balance therein to petitioners and closed out the bank account.

By the end of December 1958, the corporation was completely liquidated and all of its remaining assets were distributed equally to the two petitioners.

On March 8, 1963, respondent mailed to petitioners notices of liability for $65,668.01, plus interest as provided by law, as transferees of the corporation. The notices were based upon respondent's determination that the corporation had realized taxable ordinary income from the sale of its 760 acres in 1958, which produced a deficiency of $65,668.01 in income taxes due from the corporation for that year.

No part of the $65,668.01 has been paid by or on behalf of the corporation and there are no corporate funds or assets with which to pay said $65,668.01.

West Cocoa Acres, Inc., was a collapsible corporation within the definition of section 341(b).

### OPINION

The issue for decision is whether the corporation organized by petitioners was a collapsible corporation as defined in section 341(b). If the answer is in the affirmative, as respondent contends, the corporation is taxable on the gain from its sale of the El Pico tract, and petitioners are liable as its transferees. If it is found not to have been collapsible, respondent concedes that the corporation will recognize no gain because of section 337, and petitioners will prevail.

The facts necessary to our decision are not complex. Petitioner had become interested in the growth of Brevard County, Fla., where he had been engaged in some prior real estate transactions. He acquired the El Pico tract on September 3, 1957, shortly after he left his employment with Aviation. The purchase price was $215,000. A short time later the broker through whom petitioner had purchased the property advised petitioner that he had been contacted by a prospective purchaser. On October 11, 1957, after negotiations by the broker in petitioner's behalf had reached a satisfactory stage, petitioners, on the advice of counsel, caused the corporation to be formed and assigned the contract of purchase to it. On the same date

the corporation entered into contracts for sale of the property for $418,000, the closing date to be in May 1958. The board of directors of the corporation adopted a plan of complete liquidation on May 2, 1958, the closing was held on May 16, 1958, and the corporation was in fact liquidated in December 1958, its assets being distributed equally to the petitioners.

The issue as drawn by the parties is the collapsibility of the corporation. If it is collapsible, the corporation is denied the nonrecognition privilege of section 337 because of section 337(c)(1)(A).[2] We agree with respondent that the corporation was collapsible.

The parties are in agreement that the relevant statutory provisions are the portions of section 341(b) which define collapsible corporations and section 341 assets as follows:

SEC. 341. COLLAPSIBLE CORPORATIONS.

(b) DEFINITIONS.—

(1) COLLAPSIBLE CORPORATION.—* * * the term "collapsible corporation" means a corporation formed or availed of principally * * * for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), * * * with a view to—

(A) * * * a distribution to its shareholders, before the realization by the corporation * * * purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization by such shareholders of gain attributable to such property.

    *       *       *       *       *       *       *

(3) SECTION 341 ASSETS.—For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is—

(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year;

(B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business;

They further agree that three conditions must be met here to satisfy the definition of a collapsible corporation. It must be (1) formed or availed of principally for the purchase of property (2) which is

---

[2] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

    *       *       *       *       *       *       *

(c) LIMITATIONS.—

(1) COLLAPSIBLE CORPORATIONS AND LIQUIDATIONS TO WHICH SECTION 333 APPLIES.—This section shall not apply to any sale or exchange—

(A) made by a collapsible corporation (as defined in section 341(b)), * * *

held by the corporation primarily for sale to customers in the ordinary course of its trade or business (3) with a view to a distribution to its shareholders before the realization by the corporation of a substantial part of the taxable income to be derived from the property.

It is clear that the corporation was formed or availed of principally to purchase the El Pico tract. Whatever the motive of petitioners in forming the corporation to conceal their identity, the purpose which was served by its formation was the purchase and resale of the El Pico tract. Section 341(b) is directed toward the function performed by the corporation, not the underlying motives of the taxpayer in causing its creation. Cf. *Braunstein* v. *Commissioner*, 374 U.S. 65 (1963).

The second requisite of collapsibility is that the El Pico tract be a section 341 asset, as defined in section 341(b)(3), *supra*. Petitioner contends that the El Pico tract was neither inventory nor property held primarily for sale to customers in the ordinary course of the corporation's trade or business. Relying in part on *Maxwell Temkin*, 35 T.C. 906 (1961), and *Jacobson* v. *Commissioner*, 281 F. 2d 703 (C.A. 3, 1960), reversing 32 T.C. 893 (1959), they contend that their intention was to hold the El Pico tract as an investment rather than for sale. The above-cited cases are inapposite, and as a factual determination, we find against petitioners on this point. The cases both deal with the presence of the view to collapsibility and conclude that the corporations were not availed of with such a view because the sales were made because of unforseen circumstances.

The proper inquiry is to the purpose for which the El Pico tract was held at the time of sale by the corporation. This question is most often litigated under section 1221(1), which has spawned "a basketfull of cases." *Recordak Corporation* v. *United States*, 325 F. 2d 460, 461 (Ct. Cl. 1963). Various criteria have been judicially developed to determine whether property is held primarily for sale to customers in the ordinary course of business, but as one court has stated, "each case must in the end stand on its own bottom and must be decided on its own peculiar facts." *Murray* v. *Commissioner*, 238 F. 2d 137, 138 (C.A. 10, 1956). Without reciting the various criteria (see, e.g., *D. L. Phillips*, 24 T.C. 435 (1955); *Maudlin* v. *Commissioner*, 195 F. 2d 714 (C.A. 10, 1952); *Pool* v. *Commissioner*, 251 F. 2d 233 (C.A. 9, 1957)), we conclude that the corporation was not holding the property primarily as an investment. On the facts presented, this conclusion appears inescapable. Petitioner's transfer of the El Pico tract to the corporation at a time when negotiations for a resale had proceeded almost to the point of fruition makes it clear that the corporation's basic function was to consummate a sale. Cf. *Morris Cohen*, 39 T.C. 886 (1963). Whatever petitioner's original purpose may

have been in acquiring the property,[3] its character in the hands of the corporation can hardly be described as an investment. Since the corporation's only trade or business was to deal with this property, the El Pico tract was a "section 341 asset" within the meaning of section 341(b)(3)(B).

The remaining requisite of collapsibility is the proscribed "view," which consists of three facets: (a) a view to a distribution, (b) before realization of a substantial part of the taxable income to be derived from the property, and (c) the realization by petitioners of gain attributable to the property.

Any doubt that petitioners contemplated a distribution at the time they formed the corporation is dispelled by their attorney's letter to his law partner advising that the corporate records should be prepared "with a view to a subsequent plan of liquidation," to take place about the time of the sale to the Krohne interests. Petitioner's own testimony that the corporation was to have only a temporary existence corroborates the existence of a view to a distribution. *Max N. Tobias*, 40 T.C. 84, 99 (1963). Cf. *Southwest Properties, Inc.*, 38 T.C. 97 (1962).

This distribution was to occur before the realization of a substantial part of the taxable income to be derived from the sale of the El Pico tract. Although the corporation technically received the proceeds of the sale before the distribution to petitioners, section 1.337–1 [4] of the Income Tax Regulations provides, in part, that the nonrecognition treatment of section 337 does not apply if the shareholders would have been taxable under section 341 had the distribution been made before the sale. The validity of this regulation has been sustained by us in *Sproul Realty Co.*, 38 T.C. 844 (1962). Without such an interpretation, the section 337(c) exception for collapsible corporations would be rendered meaningless. *Sproul Realty Co.*, *supra* at 857 fn. 5. Since there was a distribution to petitioners of the proceeds and they realized gain thereon, the three conditions of the "view" are satisfied.

---

[3] Petitioners' contentions that they planned to hold the property for a subsequent appreciation in value, though immaterial to this issue, may, when coupled with Guy Van Heusden's prior real estate dealings, indicate a reason other than the concealment of petitioners' identity, for the creation of the corporation. However, since their motive for creating the corporation is immaterial, *Braunstein* v. *Commissioner*, 374 U.S. 65 (1963), we need not resolve this question in reaching our decision.

[4] Sec. 1.337–1 General.

* * * sales or exchanges made by a collapsible corporation (as defined in section 341(b)) are excluded from the operation of section 337 by section 337(c). Accordingly, except as provided in section 341(e)(4), section 337 does not apply to any sale or exchange of property whenever the distribution of such property in partial or complete liquidation to the shareholders in lieu of such sale or exchange would have resulted in the taxation of the gain from such distribution in the manner provided in section 341(a) as to any shareholder or would have resulted in the taxation of the gain in such manner, but for the application of section 341(d). * * *

We reject petitioners' contention that no view was present because the corporation "merely became the assignee of a completed package" and thus did not make any "purchase" of the property. Section 341(b)(2)(B)[5] deems a purchase to have been made where, as here, the corporation holds property having a basis determined with reference to the cost basis in the hands of one who made the purchase.

There remains one further contention by petitioners which merits a brief discussion. On reply brief petitioners contend that—

all that was to be done actually had been done before the formation of the corporation itself. The corporation did not engage in any affirmative acts stemming from its own initiative. The steps which it took were merely perfunctory and pursuant to commitments which had been previously made.

The corporation itself did not enter into the contract to purchase the real estate here in issue. This purchase agreement had already been executed and the corporation merely took an assignment of it.

Because of this, petitioners would in effect have us view the sale as having been made by them rather than by the corporation. The Supreme Court has laid this type of contention to rest in *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949), and *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943), by reaffirming the elementary principle that a corporation has an existence separate and distinct from its shareholders. The corporation in the instant case was created by petitioners to perform a business function. It was acting as a principal, not merely as an agent of petitioners, cf. *National Carbide Corp.*, *supra* at 437, and was a viable entity. Even if it were merely a de facto corporation as petitioners contend, it is taxable as a corporation pursuant to section 7701(a)(3) and the regulations thereunder.

Our decision that the El Pico tract was a "section 341 asset" is dispositive of the issue of whether the gain realized by the corporation is taxable as ordinary income or as capital gain. Cf. *Sproul Realty Co.*, *supra*.

Transferee liability having been conceded by petitioners,

*Decisions will be entered for the respondent.*

---

[5] SEC. 341. COLLAPSIBLE CORPORATIONS.

(b) DEFINITIONS.—

\* \* \* \* \* \* \*

(2) PRODUCTION OR PURCHASE OF PROPERTY.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

\* \* \* \* \* \* \*

(B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, \* \* \*